# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Dorian W., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   No. 17 CV 50327 |
| | )   Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff served in the Air Force for 20 years until he retired in the summer of 2013. He was then 41 years old and could have continued in the military and was even in line for promotion to major, according to his testimony.[1] But he retired because of multiple, "cascading" (plaintiff's term) health problems, the main ones being degenerative disc disease, fibromyalgia, and migraines. His condition worsened over the last years of his career, but he was able to continue until retirement because he transitioned to less demanding jobs, was granted waivers from physical tests, and used 45 to 50 days of vacation time. A couple years after retiring, he took a part-time job at H&R Block, but he realized from this experience that he could not work full-time.

On March 17, 2016, he filed his Title II disability application, selecting an onset date coinciding with the date he retired from the military three years earlier.[2] Plaintiff provided several pieces of evidence to support his case. This included opinions from two treating physician opinions; a finding by the Veterans Administration that he had a 100% disability

---

[1] This first paragraph is based on plaintiff's hearing testimony.
[2] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.

1

rating; and statements from his wife and his supervisor at H&R Block. After holding a hearing, the ALJ issued a written decision finding that plaintiff could do light work. The ALJ rejected the above evidence on various grounds. Plaintiff's main argument here is that the ALJ's explanations were conclusory. As plaintiff explains in his brief, "[t]hese were all sources in a far better position to observe and opine as to Plaintiff's function than the non-reviewing the state agency opinions to whom the ALJ gave great weight."[3] Dkt. #10 at 5. The Court finds this argument persuasive.

The Court will begin with and focus mostly on the strongest piece of evidence from this group. This is the second of the two opinions provided by Dr. Stephen A. Cole, who treated plaintiff for approximately 15 months and who saw him about once a month during this time. This opinion consists of two documents. The first is a 4-page form entitled "Physical Medical Source Statement." In response to many of the questions on this form, Dr. Cole handwrote "see additional form." The additional form is a detailed, typewritten 4-page analysis. There is no dispute that this opinion, if accepted, would establish that plaintiff could not work full-time.[4] But the ALJ gave this opinion "little weight" based on the following two reasons:

> It appears to be based on the claimant's subjective allegations rather than an objective assessment in the professional opinion of Dr. Cole. The claimant reports exercising and walking 45 minutes, which demonstrates he is not limited to walking 10 minutes.

R. 27. Plaintiff argues that this explanation is conclusory and fails to explicitly analyze the checklist under the treating source rule. The Court agrees. This explanation does not even reach the level of a drive by analysis of the treating physician rule.

---

[3] The ALJ did not call an impartial medical expert to testify at the hearing.
[4] Dr. Cole concluded, for example, that plaintiff could only sit or stand for 10 minutes at a time, would need to take unscheduled breaks because of his migraines, would be "off task" 15% of the day, and would miss 4 or more days a month.

As for the checklist, the Government argues that an ALJ is merely required to provide "good reasons" for rejecting a doctor's opinion and does not have to explicitly analyze the six checklist factors. However, as stated in prior opinions, this Court does not agree with this argument. By not applying the checklist, the ALJ may have failed to appreciate the strength of Dr. Cole's opinion. For example, the first two factors address the length and the nature of the treatment relationship. Dr. Cole saw plaintiff approximately 15 times (based on an average frequency of once a month over a 15-month period). The agency doctors, by contrast, never examined plaintiff. The ALJ did not acknowledge this significant difference. *See, e.g., Derry v. Berryhill*, __ Fed. Appx. __, 2019 WL 102477, *4 (7th Cir. Jan. 4, 2019) ("[The ALJ] also failed to explain why Dr. Sunn's 20-month course of treatment deserved less weight than the opinions of consultative examiners who each interacted with Derry one time over a video feed."). But the Court need not further analyze the checklist factors because even accepting the Government's looser standard, a remand is still required.

Before looking at the two rationales, the Court first notes that plaintiff's argument begins with a simple claim. Plaintiff asserts that it is "extraordinarily rare for a treating physician to take the time that Dr. Cole did in order to write such a detailed opinion." Dkt. #10 at 6. The Government has not disputed this contention. And based on its experience, this Court agrees that Dr. Cole's opinion is undeniably more extensive than the typical opinion seen by this Court in disability cases. To illustrate the level of detail, the Court sets forth below two screenshots from the opinion:

Muskoskeletal Problems: Fibromyalgia (has failed all points, chronic widespread bilateral joint pain knees, hips, shoulders, ankles, wrists, elbows), Chronic Pain Syndrome (Myofacial Pain Syndrome), Degenerative disc disease (cervical, thoracic and lumbar with multiple disc herniations, facet arthritis, spinal canal narrowing, and various mild-moderate neural foraminal encroachment), Myalgias/muscle spasms, Tietze's Syndrome/Costochondritis, Tendonitis/tenosynovitis bilateral thumbs, bilateral pectoral strain, bilateral trapezius strain

Integumentary Problems: Negative

Neurological Problems: *Mild Incomplete Paralysis: Radial nerve, Median Nerve, Ulnar Nerve, Upper radicular group (5th & 6th cervicals), Middle Radicular group, Lower Radicular Group, and Sciatic Nerve,* Bilateral Carpal Tunnel, Bilateral Sciatica, Bilateral Upper & Lower Extremity pain/numbness and tingling (constant), Moderate Bicep Denervation, Cervical Radiculopathy C6, Lumbar Radiculopathy, Phalen's Sign/Tinnel's Sign - Positive, Positive Bilateral Leg Raise, Restless Leg Syndrome, Migraine without Aura, Combination Sleep Apnea (obstructive and central), Insomnia, Central Sensitivity Syndrome, Mildly Enlarged Ventricles

\* \* \*

Psychiatric Problems: Anxiety and depression (mild-moderate), Lack of Concentration/Focus with occasional forgetfulness of names, directions and train of thought

Endocrine Problems: Hypogonadism/testicular hypofunction (low testosterone), ED, Abnormal Cortisol level (reason unknown, recovering)

Infectious Diseases, Immune Disorders, Nutritional Deficiencies: Chronic Fatigue Syndrome, Vitamin & Mineral Deficiencies, if not supplemented (Vit D, Iron, Magnesium), Positive Cyclic Citrullinated Peptide (CCP) Antibody test for Rheumatoid Arthritis (Seropositive Rheumatoid Arthritis without joint decay at this time)

Hematologic and/or Lymphatic Problems: Negative

3. Prognosis: *Greater than 50% Quality of Life reduction. Multiple complications that will likely worsen over time. Unable to work even consistent, reliable part-time work.* Physical demands, stress or environmental factors will worsen many conditions and symptoms. *Numerous conditions and limitations affecting patient's ability to work at a regular job on a sustained basis.* patient has multiple chronic conditions. Periods of significant pain can last from a few days to several weeks. In 2016, Dorian had 28 various Dr's appointments (PCM, Pain Management - *19 different thoracic & lumbar pain blocks*, Endocrinology, Gastro, Allergy) and has already had 6 various doctor visits in Jan 2017 with more scheduled in coming months.

R. 1120-21.

4

At its most basic level, plaintiff's argument is based on a simple comparison. Plaintiff argues that a 4-page medical opinion with this much detail, and written with this much care, deserved something more than a cursory and vague two-sentence analysis. But plaintiff also goes on to attack the substance of the ALJ's two rationales, to which this Court now turns.

The first rationale touches a frequently recurring topic—namely, to what extent may a doctor rely on a patient's subjective report. The general rule is that an ALJ may discount a doctor's opinion if it is based *solely* on the claimant's subjective complaints. *See generally Walls v. Colvin*, 2015 WL 7077340, *2-3 and n.3 (N.D. Ill. Nov. 13, 2015) (discussing the case law and issues in greater detail, including the importance of the word "solely"). However, doctors are permitted to rely on subjective complaints if they are part of a broader analysis. *Id.* The Seventh Circuit has noted that the diagnosis of some conditions, fibromyalgia being a prominent example, depend even more on subjective reports. *Harbin v. Colvin*, 2014 WL 4976614, *5 (N.D. Ill. Oct. 6, 2014) ("Fibromyalgia is diagnosed primarily based on a patient's subjective complaints and the absence of other causes for the complaints.").

Here, the ALJ did not explicitly acknowledge these distinctions and subtleties. Instead, the ALJ ambiguously stated that Dr. Cole's opinion "appears to be based on the claimant's subjective allegations rather than an objective assessment." R. 27. The phrase "appears to be based on" is vague on the critical question of whether Dr. Cole relied *solely* on the subjective allegations. Put aside the hedge phrase "appears to be," the phrase "based on" could mean partially based on or solely based on. The ALJ's later use of the phrase "rather than" perhaps shows that the ALJ viewed these issues in either-or terms and may have believed that the Dr. Cole relied solely on plaintiff's reports. But the ALJ's framing of this issue leaves out the middle-ground position that Dr. Cole could have made an objective assessment while still relying

in part on subjective reports along with diagnostic and other evidence as part of a comprehensive analysis.

If the ALJ, in fact, believed that Dr. Cole's opinion was based solely on subjective reports, then this would be a legitimate basis for rejecting the opinion. But it is not clear that this is what Dr. Cole did. Specifically, his opinion refers to several objective tests and measurements. These include "Pulmonary nodule (left lower lobe, calcified)"; "Hypertension (if untreated as high as 168/111)"; "Internal Hemorrhoids"; "mild-moderate neural foraminal encroachment"; "Moderate Bicep Denervation" "Positive Bilateral Leg Raise"; "low testosterone"; and "Positive Cyclic Citrullinated Peptide (CCP) Antibody test for Rheumatoid Arthritis)." R. 1120-21. Neither the ALJ, nor the Government, discussed this evidence. It suggests that Dr. Cole was relying on more than just plaintiff's say-so.

In addition to relying on objective tests, Dr. Cole also referred to plaintiff's extensive treatment history. In particular, the following sentence, which includes italics and underlining added by Dr. Cole, makes clear that he thought that this history was notable: "In 2016, Dorian had 28 various Dr's appointments (PCM, Pain Management – *19 different thoracic & lumbar pain blocks*, Endocrinology, Gastro, Allergy) and has already had 6 various doctor visits in Jan 2017 with more scheduled in the coming months." *Id.* at 1121.[5] Significantly, the ALJ never acknowledged the details and extent of these treatments.

For all the above reasons, the ALJ's first rationale is an insufficient basis for rejecting Dr. Cole's opinion.[6] The ALJ's second rationale is likewise insufficient. It was the following: "The

---

[5] In his opening brief, plaintiff provided the following longer list: "numerous treatments, including 19 different thoracic and lumbar pain blocks, steroid injections, chiropractic treatment, massage therapy, acupuncture, lidocaine patches, heat wraps, home exercise, [] physical therapy [ and] a plethora of medication, many of which have resulted in side effects." Dkt. #10 at 13 (citations omitted).

[6] If the ALJ had doubts about the basis for Dr. Cole's opinion (*i.e.* whether he was relying solely on subjective reports), she could have contacted him. In fact, at the end of the hearing, the ALJ contemplated this possibility when

6

claimant reports exercising and walking 45 minutes, which demonstrates he is not limited to walking 10 minutes." R. 27. Plaintiff's "report" is contained in the doctor's notes from a November 2014 visit. The ALJ's statement is less a fleshed-out rationale, but more of a one-off inconsistency. The concern that naturally arises when an ALJ relies on a single doctor's visit is whether it was an isolated and misleading snapshot—in this instance, one taken two and half years before the hearing—rather than a fair longitudinal picture. The statement the ALJ relied on was the following: "Exercises—when he can. In a 2 week period he exercised 8 days, did 45 min on treadmill, fast walk. When he [is] experiencing pain he can't exercise, has pain in hips and knees." R. 891. This statement makes clear that plaintiff was only able to exercise when he was not experiencing pain. This, in turn, leads to the question whether plaintiff, who had fibromyalgia, experienced flares and fluctuations in his pain. The ALJ did not explore this possibility, but it should always be considered in a case involving fibromyalgia.[7] *See, e.g., Heuschmidt v. Colvin*, 2015 WL 7710368, * 8 (Nov. 30, 2015) (the ALJ "failed to note the fluctuating nature of fibromyalgia symptoms that SSR 12-2p describes"). In fact, the "Physical Medical Source Statement" completed by Dr. Cole included a question specifically asking whether plaintiff's impairments likely produced "good days" and "bad days," and Dr. Cole checked "yes." R. 1119.

    In sum, the Court finds that the ALJ's two rationales for rejecting Dr. Cole's opinion were based on an incomplete analysis and that, for this reason alone, a remand is required.

---

she asked plaintiff to leave a medical release in case she decided "to communicate with Dr. Cole" to "get some clarification." R. 96.

[7] The ALJ clearly had experience with fibromyalgia cases. *See* R. 57 (ALJ to plaintiff: "And maybe you don't know this, but I see fibromyalgia a lot. [ ] You don't have to go through like the history of the fibromyalgia back in '97, '98 and 2010.").

The Court next considers the ALJ's decision to give "no weight" to a letter from Nicole Ellis, who was plaintiff's supervisor at H&R Block. Ms. Ellis, like Dr. Cole, drafted a detailed letter that took some time to prepare. The ALJ rejected this letter based on conclusory rationales that fail to fairly confront this piece of evidence.

Ms. Ellis made a number of observations, and the Court will not summarize them all here. She stated that she had "intimate knowledge" of plaintiff's work abilities and limitations based on her supervision of him from December 2015 until April 2016. Ex. 17E. She concluded that plaintiff was "capable of performing admirably while working part-time (most of the time)," but was not capable of working full-time because of "numerous different issues." *Id.* She described specific examples, such when plaintiff left work early due to migraines or because he was vomiting acid, as well as an incident when his back gave out causing him to slip and drop a water jug that then crashed on the floor.

The ALJ rejected this opinion for three reasons, two of which are non-starters. One was that Ms. Ellis was not "an acceptable medical source." This is true, but not a reason to reject her entire statement. *See* SSR 16-3p (instructing ALJs to consider not only information from doctors but also from "other persons," including "family and friends"). The other rationale was that the disability determination is a question "reserved to the Commissioner." This is a boilerplate truism that could be inserted at almost any point in a decision. In this Court's experience, it often acts as a contrarian indicator signaling the weakness of the ALJ's explanation.

The remaining rationale is the ALJ's claim that Ms. Ellis's statement was supposedly inconsistent with a statement plaintiff made to his doctor five months later on September 13, 2016.[8] According to the ALJ, plaintiff supposedly made a statement to his doctor that "seem[ed]

---

[8] The ALJ stated that there were two such statements, but the citations are duplicates. *Cf.* R. 1217 to R. 1079.

to suggest [plaintiff] was capable of more work" than Ms. Ellis indicated. R. 27. But the ALJ's claim is hard to verify, because the ALJ did not quote or identify the specific statements made by either plaintiff or Ms. Ellis. We are thus left to compare invisible apples and oranges. Based on the ALJ's citation, she apparently was relying on the following statement:

> [Plaintiff] was able to work [doing tax preparation] approximately 25-26 hours a week. Beyond that, he suffered too much neck and shoulder pain. He would work four to five hours per day, four days per week during tax season, January 4th through April 15-18th. The most he could work was 5 hours per day, four days in a row. He states that he couldn't work a 40 hour work week.

R. 1217. The portions of Ms. Ellis's letter that seem to match up the closest with the above statement are the following:

> He stated he would gladly work as many hours as his body would allow and asked that I be flexible in working with him. We agreed that mornings were best as his pain gets wors[e] throughout the day. On his best weeks, even twenty hours were visibly difficult for him. Mostly he worked four hour days and could only work 5 hour days intermittently. Dorian also had a very difficult time working four days in a row, so he was often scheduled with a day break after three days to get a day of rest in.
>
> \*   \*   \*
>
> I am comfortable scheduling him 16-20 hours per week, but this is likely the most he can comfortably work based on my observations and his past performance (attached are his pay stubs for the entire 2016 year, newest to oldest).

R. 355-56. Comparing the two statements, they make the same larger point that plaintiff tried to work full-time but could only work part-time. As for what was contradictory, the Court's best guess—and it is only a guess—is that it was the number of hours worked per week. The first sentence from the doctor's notes states that plaintiff worked 25 to 26 hours a week whereas Ms. Ellis's letter states that he could "comfortably" work 16 to 20 hours a week. This one possible contradiction is a highly questionable basis for rejecting Ms. Ellis's entire statement. But a closer reading of the doctor's notes indicate that the first sentence referring to 25 to 26 hours may have been a mistake because later in the same notes the doctor wrote that the "most he could work was

9

5 hours per day, four days in a row." This would translate to 20 hours a week, a figure that exactly matches Ms. Ellis's statement. In other words, there was no contradiction at all. But lost in this hunt for a testimonial contradiction is the bigger point that, regardless of the exact amount of hours worked, plaintiff was still unable to work a 40-hour week despite his best efforts.

Turning next to the statement from plaintiff's wife, the Court has similar concerns. The ALJ rejected this statement based on similar rationales. The first was that the wife's statements were "questionable" because she was "not medically trained to make exacting observations." R. 27-28. But this criticism unfairly applies a scientific measuring stick to the wife's observations about plaintiff's waking times, his morning routines, and other non-esoteric matters. The ALJ's second rationale was that the statement was "colored by affection" for plaintiff. But this is not a valid reason to reject the wife's statement because, as noted above, SSR 16-3p directly tells ALJs to consider statements from "family and friends." The ALJ's final rationale was the boilerplate assertion that the wife's statement was "simply not consistent with the preponderance of the opinions and observations of the medical doctors in this case." R. 28. But the ALJ provided no details or specific examples.

The latter rationale points to a larger failing—the ALJ never considered the collective force of all of the above evidence. In this Court's view, the opinions of Dr. Cole (as well as Dr. Pane, the other treating physician), Ms. Ellis, and plaintiff's wife are largely consistent, at least on the broader points. The ALJ did not appear to give consideration to this consistency, but instead "engaged in a piecemeal divide-and-conquer strategy, examining each opinion seriatim." *See Dallisto v. Berryhill*, 2017 WL 4512558, *2 (N.D. Ill. Oct. 10, 2017) (the ALJ glossed over the fact that the three medical opinions were consistent with each other).

Having concluded that the above arguments are sufficient to justify a remand, the Court need not consider plaintiff's remaining arguments about the ALJ's alleged failure to fully consider the VA determination and about the ALJ's various credibility rationales. However, on remand, both the ALJ and plaintiff should re-visit each of these issues to ensure that they are fully explored and analyzed, and plaintiff's counsel should specifically raise them to the ALJ, both in a pre-hearing brief and during the hearing itself. The Court notes that the ALJ sought plaintiff's counsel's guidance to identify the most important issues in the case. This seems like good practice from the Court's perspective. The Court wishes that ALJs would more often have plaintiff's counsel identify and focus on the critical issues in the case.

For the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded for further proceedings.

Date: April 11, 2019         By: _____
                                 Iain D. Johnston
                                 United States Magistrate Judge